Argued and submitted July 11, 2006, affirmed May 16, 2007

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ROGER EUGENE MAGANA,
*Defendant-Appellant.*

Lane County Circuit Court
Court Numbers 20-03-16714, 20-03-22888;
A125662 (Control), A125663

159 P3d 1163

554

Andy Simrin argued the cause and filed the brief for appellant.

Janet A. Klapstein, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Brewer, Chief Judge, and Haselton and Rosenblum, Judges.*

BREWER, C. J.

---

* Haselton, J., *vice* Linder, J.; Rosenblum, J., *vice* Richardson, S. J.

**BREWER, C. J.**

Defendant, a former City of Eugene Police Officer, was convicted of numerous crimes, including multiple sex offenses, coercion, and official misconduct, in which the victims were 12 women whom he met in the course of his duties.[1] He appeals, raising six assignments of error. We affirm.

A detailed recitation of the facts is not necessary to our resolution of defendant's assignments of error. As noted, the victims in this case were women with whom defendant came into contact in the course of his duties as a police officer, most often in the course of investigating drug, alcohol, or prostitution-related offenses or domestic disturbances. During those investigations, defendant would tell the victims that he would not arrest or cite them if they would engage in sexual activity with him. In one instance, defendant told a victim that he would have her children taken away if she resisted his sexual advances; after she complied, he promised to help her with legal matters if she kept quiet. In another instance, defendant observed a different victim making a drug purchase. He handcuffed her and put her in his patrol car, then coerced her into performing oral sex on him. Later, defendant arrested the same victim, then picked her up in his personal vehicle after she was released. He told her that he had helped to get her out of jail, and so she "owed him." He again demanded oral sex, and she complied.

Ultimately, in 2003, one of the victims called 9-1-1, leading to an investigation of defendant, indictments in two consolidated cases with a total of 52 counts, and conviction on 42 of those counts.[2] The trial court imposed consecutive

---

[1] Defendant was convicted of one count of sexual abuse in the first degree, ORS 163.427; seven counts of sexual abuse in the second degree, ORS 163.425; two counts of sexual abuse in the third degree, ORS 163.415; four counts of kidnapping in the second degree, ORS 163.225; ten counts of official misconduct in the first degree, ORS 162.415; seven counts of coercion, ORS 163.275; five counts of sodomy in the first degree, ORS 163.405; one count of attempted sodomy in the first degree; one count of rape in the first degree, ORS 163.375; three counts of harrassment, ORS 166.065; and one count of burglary in the first degree, ORS 164.225.

[2] After the first indictment was filed, the case was resubmitted to the grand jury. All but one of the counts in the first indictment were replicated in the second indictment. Then, on the state's motion, the trial court dismissed the replicated counts in the first indictment.

sentences on 17 of the counts involving 10 of the victims. The remaining counts were sentenced to be served concurrently. The total term of defendant's incarcerative sentence was 975 months.

Defendant and the state both present combined arguments on defendant's first three assignments of error. We similarly discuss those assignments together. In the assignments, defendant argues that the trial court erred by (1) disallowing his demurrer to one of the indictments on the ground that some of the counts lacked enough specificity to allow him to prepare a defense; (2) denying his motion to require the state to make pretrial elections regarding the coercion and misconduct charges; and (3) denying his motion *in limine* to exclude evidence of uncharged acts of misconduct.

■ The pertinent indictment contained 51 counts, including numerous counts of rape, sexual abuse, sodomy, harassment, kidnapping, burglary, coercion, and official misconduct. Defendant demurred to the indictment, challenging the specificity of the official misconduct and coercion counts. In particular, defendant argued that those counts were insufficient to apprise him of what conduct was alleged to constitute the violations. He renews that argument on appeal. We review a trial court's ruling on a demurrer to a charging instrument for errors of law. *E.g., State v. Couch,* 196 Or App 665, 672, 103 P3d 671 (2004), *aff'd,* 341 Or 610, 147 P3d 322 (2006).

With the exception of changing the name of the alleged victim and time period, the official misconduct counts are identical, as are the coercion counts. The third count is representative of the official misconduct counts:

> "In relation to [JS], the defendant on or between January 1, 1999 and January 1, 2003, in Lane County, Oregon, being a public servant and with the intent to obtain a benefit or harm another, did unlawfully and knowingly fail to perform a duty imposed upon him as a public servant by law, or one clearly inherent in the nature of the office, or did perform an act constituting an unauthorized exercise in official duties; contrary to statute and against the peace and dignity of the State of Oregon."

ORS 162.415 defines first-degree official misconduct as follows:

> "(1)   A public servant commits the crime of official misconduct in the first degree if with intent to obtain a benefit or to harm another:
>
> "(a)   The public servant knowingly fails to perform a duty imposed upon the public servant by law or one clearly inherent in the nature of the office; or
>
> "(b)   The public servant knowingly performs an act constituting an unauthorized exercise in official duties."

The sixth count of the indictment is representative of the coercion counts:

> "The defendant, on or between January 1, 1999 and January 1, 2003, in Lane County, Oregon, did unlawfully and knowingly compel or induce [JS] to engage in or abstain from engaging in conduct in which [JS] had a legal right to engage or abstain from engaging by means of instilling in [JS] a fear that if [JS] refrained from the conduct or engaged in the conduct contrary to the compulsion or inducement the said defendant would unlawfully use or abuse the said defendant's position as a public servant by performing some act within or related to official duties, or by failing or refusing to perform an official duty in such a manner as to affect some person adversely; contrary to statute and against the peace and dignity of the State of Oregon."

ORS 163.275 defines the crime of coercion as follows:

> "(1)   A person commits the crime of coercion when the person compels or induces another person to engage in conduct from which the other person has a legal right to abstain, or to abstain from engaging in conduct in which the other person has a legal right to engage, by means of instilling in the other person a fear that, if the other person refrains from the conduct compelled or induced or engages in conduct contrary to the compulsion or inducement, the actor or another will:
>
> "* * * * *
>
> "(g)   Unlawfully use or abuse the person's position as a public servant by performing some act within or related to

official duties, or by failing or refusing to perform an official duty, in such manner as to affect some person adversely."

■ An indictment must contain a "statement of the acts constituting the offense in ordinary and concise language, without repetition, and in such manner as to enable a person of common understanding to know what is intended[.]" ORS 132.550(7). Indictments that charge offenses using the words of the statute are generally sufficient. *State v. Hale*, 335 Or 612, 621, 75 P3d 448 (2003), *cert den*, 541 US 942 (2004) ("[W]e now confirm that, as this court so many times has held, an indictment generally is sufficient if it charges an offense in the words of the statute."). Defendant does not contest that the pertinent charges in the indictment in this case tracked the wording of the statutes defining official misconduct and coercion. Defendant also acknowledges that imprecision in an accusatory instrument may, in most cases, be cured by pretrial discovery. *E.g.*, *State v. Andre*, 178 Or App 566, 569, 38 P3d 949 (2002). However, defendant argues that charging him in the words of the statute and providing pretrial discovery were insufficient in the circumstances of this case. In particular, in defendant's view, because the statutes under which he was charged are too complex and the discovery that the state provided was too voluminous, he could not ascertain what he was alleged to have done wrong.

■ First, defendant elaborates, the official misconduct and coercion statutes contain so many alternatives that indictments that merely track the statutory wording allege little more than that a defendant "committed crimes." Defendant contends that an indictment for those crimes is insufficient if it fails to identify the defendant's alleged wrongful act or omission. To the extent that defendant argues that an accusatory instrument that charges statutory alternatives is insufficient, the Supreme Court rejected a similar argument in *State v. Fair*, 326 Or 485, 953 P2d 383 (1998). In *Fair*, the defendant was charged with racketeering under ORS 166.720(3), which provides that "[i]t is unlawful for any person * * * associated with[ ] any enterprise to conduct or participate, directly or indirectly, in such enterprise through a *pattern of racketeering activity * * *.*" (Emphasis added.) "Pattern of racketeering activity" was, at the time of the

charged misconduct, defined as "engaging in at least two incidents of racketeering activity that have the same or similar intents, results, accomplices, victims or methods of commission or otherwise are interrelated by distinguishing characteristics, including a nexus to the same enterprise, and are not isolated incidents * * *." ORS 166.715(4) (1993).[3] The defendant was charged using the statutory definition of "pattern of racketeering activity," and his demurrer focused on the sufficiency of that wording. *Fair*, 326 Or at 488. The defendant contended that an indictment for racketeering that merely tracked the statutory definition of "pattern of racketeering activity" was too conclusory, arguing that the indictment should allege facts demonstrating particular kinds of similarities or distinguishing characteristics, or a particular nexus among predicate offenses. *Id.* The Supreme Court rejected the defendant's argument:

> "At its core, defendant's argument is that the charged crime is complex, making the indictment difficult to defend against. But complex is not the same as uncertain, and difficult is not the same as indefinite. Even if it is complex or difficult to defend against, an indictment may allege multiple theories of committing the same crime in the words of the statute defining the crime."

*Id.* at 491. Similarly here, the charged crimes may be complex, making the indictment difficult to defend against, but that does not make an indictment worded using the statutory alternatives fatally insufficient.

■    Second, defendant argues that this case is like those in which the Supreme Court or this court has concluded that discovery will not cure lack of specificity in the charging instrument. Defendant primarily relies on *State v. Sanders*, 280 Or 685, 572 P2d 1307 (1977), in which the Supreme Court held that an indictment for burglary must allege the crime that the defendant intended to commit upon entry. *Id.* at 687. As we have noted, however, "*Sanders* simply recognized that in certain limited situations discovery would not supply the missing information. The defendant's intent is a

---

[3] ORS 166.715(4) has been amended numerous times since 1993 in ways that did not affect the Supreme Court's analysis or ours. *See Fair*, 326 Or at 487 n 1.

fact which would only rarely appear in a witness's statement." *City of Portland v. Aziz*, 47 Or App 937, 943 n 6, 615 P2d 1109 (1980).

Defendant's reliance on *Sanders* is misplaced, because *Sanders* turned on the *kind* of discovery available. The kind of discovery reasonably to be expected in this case would include witness statements regarding what defendant did or failed to do—exactly the kind of information that would supply the requisite specificity.

However, defendant's arguments in this case do not focus on the kind of discovery available; instead, they are directed to its volume: "[D]efendant could not realistically be expected to sift through [discovery documents] and divine which purposed acts and purported omissions corresponded to which alleged crimes." It may well be difficult to review large amounts of discovery, but merely asserting that there is much of it does not establish that it was insufficient to illuminate the indictment. Defendant did not make an offer of proof concerning what the discovery showed, and we cannot speculate about its contents. Moreover, it is reasonable to expect a defendant to read an indictment as a whole. Generally speaking, the official misconduct and coercion counts were grouped with charges of sex offenses, kidnapping, or harassment involving the same victim during the same period of time.[4] A person of ordinary understanding would have recognized that it was intended that the acts underlying those companion charges also formed the basis of the official misconduct and coercion counts and to filter the discovery provided by the state accordingly. The trial court did not err in disallowing defendant's demurrer.

■ Defendant makes related arguments with respect to election and to admission of evidence of uncharged misconduct. On the day of trial, before opening statements, defendant moved to require the state to elect which acts or events it would rely on to prove each charge. The state responded

---

[4] The single stand-alone official misconduct count was the sole charge involving one of the victims, and the single stand-alone coercion count was the sole charge involving another of the victims. Accordingly, discovery related to those victims would reasonably be understood as corresponding to those counts respectively.

that it was not required to make an election until it rested, at which point defendant could renew his motion. The trial court denied defendant's motion. Defendant then asked the court to make pretrial determinations of what evidence should be excluded as irrelevant or pertaining to inadmissible uncharged misconduct. The state responded that such a motion came too late. The trial court denied that motion as well. Ultimately, defendant did not renew his motion to require the state to make an election, nor does it appear that he objected, on relevancy or uncharged misconduct grounds, to particular testimony or other items of evidence as they were offered.

Defendant contends that, in combination, the trial court's rulings put him in an untenable position. Because, he says, the state was not compelled to elect before presenting its case, he could not distinguish between evidence that the state would ultimately rely on to prove a charge and inadmissible evidence of uncharged misconduct. Because no pretrial determinations were made about evidence that would be irrelevant or prejudicial, defendant asserts that he had no means to keep such evidence from the jury. Defendant acknowledges that he did not identify with particularity to the trial court what evidence he sought to exclude, which "[o]rdinarily * * * might create a preservation problem." However, defendant contends, it is unfair to have expected him to identify which items of evidence were subject to exclusion when he did not know which acts the state would be relying on to support each charge. Defendant further argues that, at the least, the trial court was required to weigh his need to prepare for trial against the impracticality of requiring an early election from the state. Because the record does not reflect that the trial court engaged in that weighing, defendant argues, it cannot be said that the trial court exercised its discretion here at all. If it had exercised discretion, defendant contends, the court should have concluded that the prejudice to his ability to defend himself outweighed any inconvenience to the state from having to elect at the beginning of trial.

The state responds, first, that whether and when to require an election is largely a matter of judicial discretion. The state acknowledges that it may be error for a trial court both to fail to require an election before closing arguments

*and* to decline to provide narrowing jury instructions. But, the state maintains, that is not what happened here. In this case, the court both required an election before closing argument and provided narrowing jury instructions. Moreover, the state contends that, when witnesses may have trouble recalling events precisely, practical reasons militate against compelling an early election. In this case, the victims were being called on to recall events that occurred years earlier, several had drug addiction issues or were under the influence of drugs or alcohol during their interactions with defendant, and one suffered from mental health problems. Given those circumstances, the state argues, it would have been unfair to require an early election.

With respect to defendant's challenge to the admission of collateral "bad acts" evidence, the state begins by noting a number of "procedural impediments" to that challenge. First, the state argues that defendant failed to raise the motion before trial, as the trial court had directed. Second, defendant failed to identify the particular evidence that he wanted excluded. And third, defendant did not object to particular items of evidence as they were introduced. Moreover, the state contends that defendant's challenge fails on the merits, because the evidence that went to nonelected incidents was relevant for an admissible purpose, and its probative value outweighed any danger of unfair prejudice.

Because it informs our analysis of defendant's argument concerning election, we begin with his evidentiary challenge. Defendant did not identify to the trial court or to us what evidence he found objectionable. ORAP 5.45(4)(a)(iii) provides:

> "If an assignment of error challenges an evidentiary ruling, *the assignment of error shall quote or summarize the evidence that appellant believes was erroneously admitted* or excluded. * * * *[I]f an assignment of error challenges the admission of evidence, appellant shall also identify where in the record the evidence was admitted.*"

(Emphasis added.) Although the requirements of ORAP 5.45(4) serve to allow appellate courts to determine whether issues were adequately preserved before the trial court, they also facilitate appellate review of issues on their merits. If we

do not know with particularity what evidence a party objects to, we cannot assess whether the evidence was properly admitted. Defendant acknowledges that he did not specify to the trial court what evidence he objected to and that that fact "ordinarily" might present a preservation problem. He contends, however, that it would have been impossible to identify that evidence without an election by the state. Expressing no opinion about defendant's argument about preservation, we are hamstrung to assess his challenge on appeal by his failure to identify *on appeal* the objectionable items of evidence. On appeal, defendant contends that some unspecified evidence was irrelevant or should have been excluded because it related to uncharged misconduct. However, without knowing what the objectionable evidence was, we cannot perform our reviewing function. Stated differently, we cannot evaluate whether evidence was relevant or whether evidence related to uncharged misconduct and, if so, whether the evidence nonetheless was admissible for some proper purpose, let alone determine whether any error in admitting the evidence was harmless, if we do not know what the evidence was.

Furthermore, although defendant did not renew his motion to require the state to make an election, the state did elect: the jury instructions particularly identified the factual predicate for each charge. Given that defendant had a clear indication of what facts the state relied on to support each charge at the time that he prepared his brief on appeal, the "straws in the haystack" argument that he raises to parry a preservation problem is unavailing as to appellate review on the merits. Because defendant did not identify on appeal what evidence he believes should have been excluded, we reject his argument that the trial court erred in denying his motion to exclude evidence.

■ We turn to defendant's election argument. Defendant contends that the state should have been required to elect a particular factual predicate for each charge before it began to present its case. That is so, defendant argues, because, without an election at that stage, his ability to defend himself was prejudiced. Moreover, in defendant's view, that prejudice outweighed any detriment to the state's case that would have resulted from an early election.

"[J]uries must agree on the factual occurrences that constitute the statutorily defined elements of the crime at issue[.]" *State v. Houston*, 147 Or App 285, 292, 935 P2d 1242 (1997). However, "the trial court generally has the discretion to address the problem either by requiring the state to elect at the close of its case-in-chief or by giving appropriate jury instructions." *Id.* In addition, the timing of any election is within the discretion of the trial court:

> " '* * * No statute of this state prescribes the time when an election must be made. We are aware of no reason which demands a holding that the election in all cases must be made at this or that stage of the case. It appears to us that the administration of justice will be better served if the rule governing election is flexible so that the state will not be forced to make a choice when it cannot intelligently do so, but which will afford the defendant sufficient time, after the choice has been made, to defend himself properly.' "

*State v. Kibler*, 1 Or App 208, 212, 461 P2d 72 (1969) (quoting *State of Oregon v. Lee*, 202 Or 592, 607, 276 P2d 946 (1954)); *see also State v. Yielding*, 238 Or 419, 423, 395 P2d 172 (1964) ("[T]he trial court need not require the state to elect until there has been enough testimony received to enable the prosecution to make an intelligent choice.").

Defendant argues that, under the circumstances of this case, the trial court should have exercised its discretion to require an early election. As noted, he first contends that there is no indication that the trial court exercised its discretion at all. If it had exercised discretion, he argues, the balance should have weighed in his favor. Defendant relies in part on the Supreme Court's statement in *Yielding* that, "[i]n the exercise of its discretion, the trial court should require the state to settle upon a specific criminal act as soon as it can reasonably do so." *Id.* at 424. Defendant contends that nothing in the record indicates that it would have been impractical to require the state to elect before trial began, whereas, on the other hand, he demonstrated that his defense would be prejudiced if there was no pretrial election because he would be unable to identify irrelevant or otherwise inadmissible evidence.

■    As noted, we review a trial court's ruling regarding the timing of an election for abuse of discretion. When presented with a motion to compel an election, a trial court must balance the state's and a defendant's interests: "[T]he rule governing election is flexible so that the state will not be forced to make a choice when it cannot intelligently do so, but which will afford the defendant sufficient time, after the choice has been made, to defend himself properly." *Lee*, 202 Or at 607. Although we review for abuse of discretion, the Supreme Court also has indicated that a trial court "*should* compel an election when it appears that if the application is denied, the defendant will be prejudiced or he will be prevented from properly making his defense[.]" *State v. Keelen*, 103 Or 172, 180, 203 P 306 (1922) (emphasis added).

We are not oblivious to the "whipsaw" effect that underlies defendant's challenges to the denial of his motion to require a pretrial election and his motion to exclude evidence. If an election is not required until after the state rests, it is possible that the state will have introduced evidence to which a defendant would have objected, had the defendant known in advance which acts or events would be elected to serve as the factual bases that the state would ultimately rely on. However, as we explained in our discussion of defendant's challenge to the denial of his motion to exclude evidence, we are stymied in our review function by his failure to identify with particularity *on appeal* how he was in fact prejudiced by the lack of a pretrial election. Accordingly, we cannot say that defendant was prejudiced at all by the lack of a pretrial election. Even if we could identify such prejudice, for the same reason we cannot say that it was an abuse of discretion for the trial court to conclude that the prejudice to defendant did not outweigh the state's legitimate concerns, given issues of lapse of time and the mental state of various witnesses, that it could not intelligently make an early election. In short, even if we were to assume that the trial court either did not exercise its discretion or abused its discretion in declining to require a pretrial election, defendant provides us with no grounds from which we could conclude that the error was unfairly prejudicial. Accordingly, we reject defendant's assignment of error regarding the trial court's denial of his motion to require the state to make a pretrial election.

██      In his fourth assignment of error, defendant argues that the trial court erred in denying his motion to suppress evidence of his cell phone records. The state obtained the records from defendant's cell phone service providers by subpoena. The records included lists of the telephone numbers of incoming and outgoing calls on defendant's cell phone, not any communicative content of those calls. The police used the records to discover additional victims and to corroborate victims' claims that they were in frequent telephone contact with defendant. Defendant moved to suppress the cell phone records and the evidence derived from those records, arguing that he had a privacy interest in the records and that, accordingly, by obtaining them by subpoena, the state engaged in a warrantless search in violation of Article I, section 9, of the Oregon Constitution. After a hearing, the trial court denied defendant's motion, concluding that no privacy interest existed in defendant's cell phone records. We review that ruling for errors of law. *State v. Johnson*, 340 Or 319, 336, 131 P3d 173 (2006) (whether a constitutionally protected privacy interest exists is a question of law).

██      On appeal, defendant renews his argument that the procurement by police of his cell phone records was a warrantless search that violated Article I, section 9, of the Oregon Constitution.[5] The state argues, among other things, that an argument identical to defendant's was rejected by the Supreme Court in *Johnson*, 340 Or at 335-36.

In *Johnson*, the state subpoenaed the defendant's cell phone records from his cell phone service provider. The defendant argued that he had a privacy interest in the

---

[5] On appeal, defendant also raises an argument under the Fourth Amendment to the United States Constitution. Contrary to representations in defendant's brief, defendant did not cite the Fourth Amendment or raise a federal constitutional argument in his motion to suppress or the memorandum accompanying it, nor did he mention the Fourth Amendment during the hearing below. Defendant's Fourth Amendment argument is not preserved, and we do not address it. ORAP 5.45(1); *see State v. Toste*, 196 Or App 11, 16-17, 100 P3d 738 (2004), *rev den*, 338 Or 57 (2005) (a defendant's arguments under Article I, section 9, of the Oregon Constitution do not preserve federal Fourth Amendment arguments); *State v. Pope*, 150 Or App 457, 463, 946 P2d 1157 (1997), *rev den*, 327 Or 521 (1998) (merely citing the Fourth Amendment in a motion to suppress does not preserve the issue for appellate review).

records, "in that they pertained to his activities and transactions in areas that the legislature has recognized as private." *Id.* at 335. Because he had a privacy interest in the records, the defendant contended, obtaining them was a search that was unlawful in the absence of a warrant or warrant exception.

The Supreme Court rejected the defendant's argument:

"Defendant clearly had a cognizable privacy interest in the *content* of his telephone calls. *See* ORS 133.724 (setting out requirement that police obtain judicially issued warrant to intercept a telephonic communication). However, we cannot identify a source of law that establishes that defendant also had some interest in keeping private any records kept by a third party, his cellular telephone provider, respecting his cellular telephone usage. The cellular telephone provider generated and maintained those records from the provider's own equipment and for the provider's own, separate, and legitimate business purposes (such as billing). * * * Neither are we aware of any principle that would prevent the cellular telephone provider from responding to a proper subpoena."

*Id.* at 336 (emphasis in original). The court held that the trial court did not err in denying the defendant's motion to suppress evidence of his cell phone records.

Defendant contends that we should not reject his argument by relying on *Johnson*. In defendant's view, although the court in that case could not identify a source of law establishing a privacy interest in cell phone records, the court failed to consider ORS 165.657 to 165.673, a series of statutes that set out permissible and impermissible uses of "pen registers" and "trap and trace devices." Moreover, according to defendant, in *Johnson* the court failed to consider its own previous and controlling case, *Nielson v. Bryson*, 257 Or 179, 477 P2d 714 (1970).

The most direct answer to defendant's arguments is that they must be made to the Supreme Court. We are not free to disregard that court's holding, which was that obtaining cell phone records by subpoena from a cell phone service

provider does not invade a cognizable Article I, section 9, privacy interest and, accordingly, is not a search that requires a warrant or warrant substitute. That holding directly applies here and requires the conclusion that the trial court in this case did not err in denying defendant's motion to suppress evidence of defendant's cell phone records.

In any event, defendant's arguments are not well taken. Defendant's first argument is grounded in ORS 165.657 to 165.673, which, as noted, set out permissible and impermissible uses of "pen registers" and "trap and trace devices." ORS 165.657 defines those devices as follows:

> "(2) 'Pen register' means a device which records or decodes electronic or other impulses which identify the numbers dialed or otherwise transmitted on the telephone line to which such device is attached, but does not include any device used by a provider or customer of a provider of electronic or wire communication service for billing or recording as an incident to billing for communications services provided by such provider or any device used by a provider or customer of a wire communication service for cost accounting or other like purposes in the ordinary course of its business.
>
> "* * * * *
>
> "(4) 'Trap and trace device' means a device which captures the incoming electronic or other impulses which identify the originating number of an instrument or device from which a wire or electronic communication was transmitted."

ORS 165.659 generally prohibits the installation or use of either device, subject to exceptions provided in a list of more than a dozen statutes. Defendant argues that ORS 165.659 "created (or recognized)" an Article I, section 9, privacy interest in cell phone records and that the state unconstitutionally invaded that protected privacy interest when it obtained those records by subpoena.

The state initially observes that, before the trial court, defendant did not cite any statute in ORS chapter 165 in support of his motion. As to the merits, the state first responds that the cell phone records in this case were discoverable business records. As such, the records were the proper

objects of a subpoena under ORCP 55, ORS 136.563, and ORS 136.580(1), and disclosure of business records does not constitute a search. As to whether ORS 165.659 creates a privacy interest, the state first contends that the device used to create the records at issue here does not fall within the definition of either a pen register or a trap and trace device. Second, the state argues that there was no search in this case because no state action was involved in obtaining the information. According to the state, the cell phone service providers here used the device to generate a list of telephone numbers not as state agents, but as part of their regular business activities. Thus, the creation of the record was not the product of state action, and, according to the state, the later use of a subpoena to obtain those records did not retroactively transform the service providers into state actors. Third, the state argues, even if the protections of ORS 165.659 could be said to apply here, the existence of those statutory protections does not itself create constitutionally protected privacy or possessory interests. According to the state, we should regard the cell phone records in this case as we viewed the hospital records in *State v. Gonzalez*, 120 Or App 249, 852 P2d 851, *rev den*, 318 Or 61 (1993). In that case, we held that, because certain subpoenaed hospital records were "owned, made, kept and guarded" by the hospital, *id.* at 256, they could be obtained by subpoena without constitutional transgression.

As the state notes, before the trial court, defendant did not ground his argument on ORS 165.657 to 165.673. Assuming without deciding that the issue was preserved and that the records here were obtained by means of one of the enumerated devices, defendant's argument that those statutes create or recognize a protectible privacy interest in these circumstances is not well taken. As noted, ORS 165.659 prohibits the installation and use of pen registers and trap and trace devices subject to a number of enumerated statutory exceptions. One of those exceptions is directly applicable here. ORS 165.661 provides, in part:

"The provider of electronic or wire communication service may use a pen register or a trap and trace device:

"(1) In the operation, maintenance and testing of a wire or electronic communication service * * * [.]"

There is no dispute that the cell phone records in this case were created in the course of the regular operations of the cell phone providers. Accordingly, under ORS 165.661(1), even if those records were created by use of a pen register or trap and trace device, such use of those devices is allowed by statute. *See also Gonzalez*, 120 Or App at 256 (where state obtained the defendant's medical records from a hospital, the state did not interfere with the defendant's Article I, section 9, privacy interests).

Second, defendant argues that, in *Johnson*, the Supreme Court failed to consider its previous decision in *Nielson*. In *Nielson*, a mandamus proceeding, the Supreme Court set aside a circuit court order requiring the petitioner's doctors and their medical records custodians to appear for deposition and produce records. The court based its holding on *former* ORS 44.040 (1969), *repealed by* Or Laws 1981, ch 892, § 98,[6] which expressly conferred a privilege on physician-patient communications. In light of that express statutory privilege, the court concluded:

"[I]n the absence of an intentional and expressed consent, the privilege created by ORS 44.040(1)(d) relating to confidential communications between physician and patient can only be terminated in the manner provided by the terms of ORS 44.040(2) or by the terms of some other statute."

*Nielson*, 257 Or at 184. Because the petitioner had not intentionally and expressly consented to disclosure of the communications and no other statute provided for waiver, the privilege in that case had not been waived. *Id.*

Defendant argues that ORS 165.657 to 165.673 similarly confer a privilege with respect to his cell phone records and that privilege exists until he expressly waives it. Defendant's argument fails for several reasons. First, no communicative content of defendant's is involved here; the analogy between physician-patient communications and a list of phone numbers does not hold. *See Johnson*, 340 Or at 336 (distinguishing between content of telephone calls and business records of cell phone provider; analogizing the latter to

---

[6] *Former* ORS 44.040 was amended a number of times after 1969 and before its repeal in 1981. The amendments are not relevant to our analysis.

the monitoring by transmitter of an employee's movements in her employee's vehicle as in *State v. Meredith*, 337 Or 299, 96 P3d 342 (2004)). Second, the Supreme Court in *Nielson* concluded that *former* ORS 44.040 created a privilege because the statute provided that "there are particular relations in which it is the policy of the law to encourage confidence," including the relationship between "a regular physician or surgeon" and his or her patient. ORS 165.657 to 165.673 do not express that policy and do not create a privilege in the kind of cell phone records at issue here.

In his final assignment of error, defendant challenges the trial court's imposition of consecutive sentences for 15 of his convictions.[7] Defendant argued to the trial court and reiterates on appeal that, under the Sixth Amendment to the United States Constitution, he was entitled to a jury determination of the factual prerequisites to the imposition of the consecutive sentences.

We rejected the argument that such judicial fact-finding violates the Sixth Amendment in *State v. Carson*, 211 Or App 606, 156 P3d 71 (2007), and *State v. Tanner*, 210 Or App 70, 150 P3d 31 (2006). The trial court did not err in imposing consecutive sentences as it did in this case.[8]

Affirmed.

---

[7] As noted, defendant received consecutive sentences in connection with 17 of his convictions. 212 Or App at 555. However, on appeal, he raises challenges with respect to only 15 of those convictions.

[8] Defendant's fifth assignment of error does not require discussion.